UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| DONALD R. ROUTHIER and MICHELLE ROUTHIER,    )<br>)<br>  Plaintiffs,    )<br>)<br>  v.    )<br>)<br>WILLIAM GOGGINS and MICHAEL WELCH,    )<br>)<br>  Defendants.    ) | Case No. 5:16-cv-102 |

**OPINION AND ORDER ON MOTION TO DISMISS**
**(Doc. 21)**

Donald Routhier, the owner of a tavern in Barre, Vermont, and Michelle Routhier, a bartender at the tavern, have sued William Goggins and Michael Welch, agents of the Vermont Department of Liquor Control. The Routhiers allege that Goggins and Welch violated their civil rights by conducting a warrantless administrative search and by seizing a video recording and video player that were part of the tavern's security system. Defendants have moved to dismiss the amended complaint for failure to state a claim. (Doc. 21.) The court held a hearing on the motion on October 11, 2016.

**Background**

According to the complaint, Donald Routhier owns Jerry's Sports Tavern in Barre, Vermont, and holds a liquor license issued by the Department of Liquor Control. (Doc. 19 ¶ 5.) On March 21, 2016, without any prior notice, Welch entered the tavern and demanded that Michelle Routhier, who was working, turn over the "electronically stored video recording of an incident" that occurred at the tavern on March 11. (*Id.* ¶¶ 15–16, 27.) The complaint does not

specify the nature of the "incident."[1] Michelle called Donald to see how she should respond.[2] (*Id.* ¶ 16.) Over the phone, Donald asked Welch for twenty-four hours to consult with an attorney before responding to the request. (*Id.* ¶ 17.) Welch then left the tavern without the video recording. (*Id.*)

Welch, accompanied by Goggins, returned to the tavern later that day, around 3:30 p.m. (Doc. 19 ¶ 19.) Welch and Goggins "aggressively entered the bar" and again demanded that Michelle turn over the video recording. (*Id.* ¶ 20.) They escorted Michelle to the "kitchen area" of the bar and "demanded that she immediately surrender the video and video player that was part of the security system in place." (*Id.* ¶ 21.) Michelle asked the men to produce legal authorization for seizing the recording. (*Id.* ¶ 22.) They informed her that they did not need legal authorization because the Routhiers were licensees of the Department of Liquor Control. (*Id.*)

Michelle called Donald again and handed the phone to Goggins. (Doc. 19 ¶ 23.) Over the phone, Donald again requested twenty-four hours to "consult with an attorney before responding to their demand" for the recording. (*Id.* ¶ 24.) Goggins told Donald that the agents had authority to seize the recording now and would not wait for him to consult an attorney. (*Id.* ¶ 25.) "Welch and Goggins then immediately . . . tore the videotape and video player from the wall, . . . seizing the same and rendering the entire security system inoperable." (*Id.* ¶ 26.) It cost Donald $400 to buy a new security surveillance system. (*Id.* ¶ 30.)

---

[1] At oral argument, counsel for Defendants stated that the agents were seeking videotape of a fight that occurred at the tavern on March 11.

[2] To distinguish between Plaintiffs, the court refers to Donald Routhier and Michelle Routhier by their first names. No disrespect is intended.

Plaintiffs filed their initial complaint on April 15, 2016, three and a half weeks after the incident. (Doc. 1.) In their amended complaint, Plaintiffs assert several federal constitutional claims and related state-law claims. Counts I and II allege that Defendants violated Donald's Fourth Amendment rights in searching the tavern's electronic surveillance system and seizing the video recording and video player without lawful justification. (Doc. 19 ¶¶ 32–46.) Counts III and IV allege that Defendants' conduct also violated Donald's right to "procedural due process" and his "substantive property rights without due process." (*Id.* ¶¶ 47–51.) Count V alleges that Defendants' conduct violated Donald's right under the Vermont Constitution to be free from unreasonable search and seizure and Count VI is a claim for replevin of the videotape and video player. (*Id.* ¶¶ 52–62.) Two more counts, both titled "Count VII," assert a claim of negligent infliction of emotional distress on behalf of Michelle and a general claim of gross negligence on behalf of both Plaintiffs. (*Id.* ¶¶ 63–71.) Count VIII is a request for punitive damages. (*Id.* ¶¶ 72–73.)

Defendants have moved to dismiss the complaint, arguing that most counts fail to state a claim and that the court lacks jurisdiction over one of the state-law counts. (Doc. 21.)

## Analysis

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all facts as alleged in the complaint and "draw[s] all reasonable inferences in the plaintiff's favor. *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

I.       **Fourth Amendment Claims**

   A.       **Constitutional Violation**

Under most circumstances, the Fourth Amendment requires a state actor to obtain a warrant based on probable cause before conducting a search. *Kentucky v. King*, 563 U.S. 452, 459 (2011). There are exceptions to this rule, including an exception for administrative searches of the premises of a closely regulated business. *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015). But while administrative searches may be conducted without a warrant, they are not exempt from the Fourth Amendment's requirement that they be reasonable. *New York v. Burger*, 482 U.S. 691, 702 (1987); *Bruce v. Beary*, 498 F.3d 1232, 1243 (11th Cir. 2007) ("[A]dministrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the Fourth Amendment's requirement for reasonableness.").

In *Burger*, the Supreme Court offered three criteria for determining when a warrantless administrative search is reasonable. 482 U.S. at 702–03. These criteria are: first, whether there is a "substantial government interest that informs the regulatory scheme"; second, whether warrantless inspections are "necessary to further the regulatory scheme;" and third, whether the administrative scheme's "inspection program . . . provides a constitutionally adequate substitute for a warrant" by both "advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope" and "limit[ing] the discretion of the inspecting officers." *Id.* (internal quotation marks, alterations, and citations omitted); *see also Anobile v. Pelligrino*, 303 F.3d 107, 117–18 (2d Cir. 2001). An administrative search under a scheme that meets these criteria nonetheless can be unreasonable under the Fourth Amendment if it exceeds its statutorily authorized scope. *Club Retro, L.L.C. v. Hilton*, 568 F.3d

181, 201 (5th Cir. 2009); *Bruce*, 498 F.3d at 1248; *United States v. Knight*, 306 F.3d 534, 536 (8th Cir. 2002).

The court agrees with Defendants that the sale of alcohol in Vermont is a closely regulated industry for which warrantless administrative searches are permitted. The courts have long recognized that regulation of the production, distribution, and sale of alcohol is informed by a substantial government interest, *see Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970), and Vermont is no exception. *See In re DLC Corp.*, 167 Vt. 544, 547–48, 712 A.2d 389, 391–92 (1998).

Regulation of the sale of alcohol in Vermont is comprehensive. The liquor control statutes prohibit the importation, distribution, or sale of alcohol except as authorized, 7 V.S.A. § 61; establish a licensing regime, *id.* §§ 221–42; authorize the Liquor Control Board to enforce the statutes and promulgate regulations, *id.* §§ 104, 108; and authorize imposition of a fine or suspension or revocation of a license if a licensee fails to abide by applicable laws and regulations, *id.* § 236. The Liquor Control Board has also issued detailed "General Regulations" by which licensees must abide. 14-1 Vt. Code R. § 3. These regulations govern many aspects of operating a licensed premises. They also require licensees to allow inspection of their licensed premises and records at any time. *Id.* § 3(7).

Warrantless inspections also may be "necessary to further the regulatory scheme." Unannounced inspections are essential to ensuring that regulations prohibiting the sale of alcohol to minors or those already intoxicated are strictly enforced. *See Crosby v. Paulk*, 187 F.3d 1339, 1346–47 (11th Cir. 1999).

The regulatory scheme also places licensees on notice that they are subject to warrantless administrative search and limits who may conduct the search and what locations and items are subject to search:

> Licensees and licensee employees shall allow at any time, a member of the Liquor Control Board, the Commissioner, and/or any of their assistants or Investigators to examine the licensed premises as well as all records, papers, stock, merchandise or equipment in reference to the operation of the license, and shall retain such items for inspection. All licensees shall keep on their licensed premises for a period of two years a complete record covering the operation of their license, including all invoices covering the purchase of alcoholic beverages and/or tobacco, and all financial records including but not limited to daily receipts for the sale of alcohol and/or tobacco. If any licensee has more than one licensed location, the licensee may keep all records in one centralized business location in the State of Vermont and the Department shall be notified in writing, in advance, of the name, street address, and telephone number of such designated location. However, the licensee shall retain all training certificates and records, on the licensed premises where the individual in question works.

14-1 Vt. Code. R. § 3(7).

But while Vermont's regulatory scheme may pass constitutional scrutiny, it is less certain whether the search and seizure conducted by Defendants fell within the scope of that scheme. Defendants argue that the video recording seized is a "record . . . in reference to the operation of the license" as that term is used in § 3(7). (Doc. 21 at 11–12; Doc. 23 at 5–7.) They point out that the video recording is of the tavern in operation and includes footage of employees and customers, and that the purpose of the surveillance system was to promote the safety of the tavern's employees and patrons. (Doc. 23 at 5–6.) As a video recording of what was happening at the tavern on the night in question, Defendants contend, it is therefore a record of "the operation of the license" because it chronicles compliance (or a lack of compliance) with the many regulations governing the service of alcoholic beverages and the conduct of both employees and patrons. (*Id.* at 6.)

The regulatory phrase "records . . . in reference to the operation of the license," should not be construed as broadly as Defendants assert.  In interpreting a statute or regulation, the court looks first to the statute's "plain meaning," as determined by dictionary definitions, "the specific context in which that language is used," and "the broader context of the statute as a whole." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), *petition for cert. filed*, No. 16-639 (U.S. Nov. 14, 2016).  The closest applicable definition of the word "record" is "an account in writing or print (as in a document) or in some other permanent form . . . intended to perpetuate a knowledge of acts or events." *Record*, Merriam Webster's Dictionary, http://unabridged.merriam-webster.com/unabridged/record (last visited Dec. 6, 2016).  Nothing in this definition excludes a surveillance videotape or video recording from the definition of "record" in the statute, but, as discussed below, the specific context of the term's usage and the broader context of the statute as a whole suggest the term is not used so broadly.

In addition to the sentence authorizing administrative search provisions, § 3(7) specifies that licensees "shall keep . . . for a period of two years a complete record covering the operation of the license, including all invoices covering the purchase of alcohol beverages . . . , and all financial records including but not limited to daily receipts for the sale of alcohol."  It is unlikely that "record . . . in reference to the operation of the license" includes video recordings, given the requirement that a licensee keep "a complete record covering the operation of the license" for two years.  Storing two years of video recordings, in either an analog or digital format, is an enormous financial and logistical undertaking, quite unlike storing two years of invoices, receipts, training certificates, or other documents produced in the ordinary course of business.  Moreover, the normal practice of businesses that maintain security surveillance systems is to write over video recordings after a few days or a few months, unless law enforcement or

someone else has requested that they be saved or preserved.[3] Nothing in the regulations requires licensees to install video surveillance systems, so it is unreasonable to conclude that the law requires licensees who have installed such a system to subject themselves to the onerous burden of collecting and maintaining two years' worth of video recordings.

But even assuming the video recording in question was a "record[] . . . in reference to the operation of the license," the agents' search and seizure was still unlawful because it exceeded the scope of the authorizing statute. *See Colonnade*, 397 U.S. at 74–77; *Bruce*, 498 F.3d at 1243–44 (administrative search which exceeds authorizing statute is unlawful); *Showers v. Spangler*, 182 F.3d 165, 173–74 (3d Cir. 1999). Defendants argue that the regulation, by authorizing warrantless inspections, inherently authorizes warrantless seizures. But by its terms, § 3(7) provides agents with authority only to "examine" records; it does not authorize agents to seize records.[4] *Burger*'s third requirement—that statutes authorizing warrantless administrative searches be "sufficiently comprehensive and defined" and that searches be "carefully limited in time, place, and scope"—is about *limiting* the discretion of state agents. *See Bruce*, 498 F.3d at 1240. This requirement is defeated if a regulation authorizing agents to warrantlessly "examine" premises and records is construed expansively to authorize agents to warrantlessly *seize* any items subject to examination. Defendants therefore had no authorization to seize the

---

[3] *See, e.g., Van De Wiele v. Acme Supermarkets*, No. 13-5924, 2015 WL 4508376, at *4 (D.N.J. July 24, 2015) (video surveillance system automatically tapes over old recordings after 60 days); *Prewitt v. United States*, Nos. 10 C 102, 11 C 3136, 2012 WL 5381281, at *3 (N.D. Ill. Oct. 31, 2012) (same, after 72 hours); *Britton v. Wal-Mart Stores East, L.P.*, No. 4:11cv32, 2011 WL 3236189, at *5 (N.D. Fl. June 8, 2011) (same, after 30 to 45 days, depending on the video recorder).

[4] Of course, nothing necessarily prohibits an administrative search regulation that authorizes seizure of items. *See, e.g., Anobile*, 303 F.3d at 112, 116 (examining without criticizing administrative search regulation for horse racing that included authorization to seize drugs or other prohibited articles).

video recording in question and certainly no authority to seize the video player. *See Winters v. Bd. of Cty. Comm'rs*, 4 F.3d 848, 854 (10th Cir. 1993) (holding that police officer violated Fourth Amendment when he seized diamond ring from pawnshop under guise of an administrative search where the administrative statute did "not permit the officer to seize any evidence, but merely to examine it").

Defendants argue that Plaintiffs' refusal to allow them to either view or seize the video recording gave them authority to seize it,[5] both as an exercise of their inherent authority under the administrative scheme and in light of "exigent circumstances," since there was a risk that Plaintiffs might "alter[] or delet[e]" the videotape after having refused Defendants' request. (Doc. 23 at 5, 7 n.4.)

Defendants' assertion that their seizure simply "follow[s] from duly adopted regulations" once Plaintiffs refused to cooperate is unconvincing. (Doc. 23 at 5.) The regulations provide investigators with a remedy if a licensee resists their attempts to conduct an administrative search, and it is not a warrantless seizure. Plaintiffs' conduct—assuming Defendants requested to examine, but not to seize, the video recording—arguably violated at least two regulations: § 3(7), which requires that "[l]icensees and licensee employees shall allow at any time . . . Investigators to examine . . . records," and § 3(7)(a), which prohibits licensees and their employees from "interfer[ing] with" or "fail[ing] to cooperate with" investigators. The liquor control statutes provide that the violation of any liquor control statutes or regulations—including

---

[5] In their motion, Defendants characterize their initial request as one to "view the bar's video surveillance" and suggest that they only "seiz[ed] the video and playback equipment after Plaintiffs twice denied them access to the video." (Doc. 21 at 11.) But this misstates the complaint's allegations. Per the complaint, Defendants never requested to see the videotape, they demanded only to seize it. (Doc. 19 ¶¶ 15, 21, 25.)

those relating to permitting administrative searches and cooperating with investigators—can be punished by imposition of a fine or suspension or revocation of the licensee's license. 7 V.S.A. § 236.

This regime is identical to the one considered by the Supreme Court in *Colonnade*. In that case, federal agents visited a catering establishment, investigating a "possible violation of the Federal excise tax law" and demanded, without a warrant, that a "locked liquor storeroom" be opened. *Colonnade*, 397 U.S. at 73. When the president of the catering company refused, the agents broke the lock and removed bottles of liquor that they believed had been illegally refilled. *Id.* The statute authorizing the warrantless administrative search provided only for the imposition of a fine against a person who refused to permit an agent to conduct a search or to examine the relevant "taxable articles." *Id.* at 74. The Court ruled that the entry by force was not authorized by statute and was therefore unlawful. *Id.* at 77. While Congress had "broad authority to fashion standards of reasonableness for searches and seizures" respecting the regulation of the liquor industry, the Court explained, "the existing statutes . . . [did] not include forcible entries without a warrant," but only punished a refusal to allow a search by imposition of a fine. *Id.* at 77.

As in *Colonnade*, Defendants in this case conducted a forcible search and seizure unauthorized by the administrative regulations they were enforcing. They therefore exceeded the scope of administrative searches authorized by the regulations, and violated Donald's Fourth Amendment rights.

Nor does the doctrine of exigent circumstances justify the seizure. State agents may conduct a warrantless search or seizure "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the

10

Fourth Amendment." *King*, 563 U.S. at 460 (internal quotation marks and alteration omitted). Exigencies include "the need to prevent the imminent destruction of evidence," *id.* at 460 (internal quotation marks omitted), which is the exigency that Defendants invoke here. But no conduct by Plaintiffs suggested that they were stalling with an intent to destroy the video recording—they requested only to speak with an attorney before permitting Defendants to search or seize the video recording. *Cf. United States v. Andino*, 768 F.3d 94, 98–99 (2d Cir. 2014) (holding that exigent circumstances existed where "[u]pon learning that officers were looking for cocaine, [defendant] slammed shut the front door, ran from the door, opened and closed drawers, and turned on the kitchen faucet").

### B.  Qualified Immunity

Defendants assert that they are entitled to qualified immunity regarding Donald's federal constitutional claims. (Doc. 21 at 14–16.) Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Having already determined that, as alleged, Defendants violated Donald's rights under the Fourth Amendment, the only remaining question is "whether the right at issue was 'clearly established' at the time of defendant[s'] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is clearly established when "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Moreover, the right "must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). This is an inquiry that "must be undertaken in light

of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal quotation marks and citation omitted).

The court concludes that the relevant qualified immunity question in this case is whether a reasonable agent should have known that he was violating the Fourth Amendment in seizing an item during an administrative search under a regulation that expressly authorizes only examination of the item. The court concludes that a reasonable agent should have known he was violating the Fourth Amendment under those circumstances. In *Colonnade*, the Supreme Court invalidated a forcible entry into a locked storeroom during an administrative search because the administrative scheme did not empower the agents to conduct a warrantless forcible entry. 397 U.S. at 77. In *Winters*, the Tenth Circuit invalidated the warrantless seizure of a diamond ring from a pawnshop during an administrative search. 4 F.3d at 854–55.[6] As that court explained, the administrative scheme did "not permit the officer to seize any evidence, but merely to examine it. . . . If we were to allow an officer under the guise of an administrative statute to seize evidence of criminal activity without a warrant when the officer has a particularized suspicion regarding that evidence, we would eradicate the Fourth Amendment protections enjoyed by the pawnshop." *Id.* at 854.

Moreover, the broader principle that administrative searches violate the Fourth Amendment when they exceed their authorized scope has been emphasized repeatedly by the circuit courts. *See Club Retro*, 568 F.3d at 201 ("We thus conclude that defendants' S.W.A.T. team entries and extensive searches, as described in the amended complaint, unreasonably exceeded the scope of Louisiana and Rapides Parish administrative inspection laws. Any other conclusion would allow the administrative inspection exception to swallow the Fourth

---

[6] The court may look to case law from other circuits to determine whether a constitutional right was clearly established. *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010).

Amendment's warrant requirement for searches of private property." (footnote omitted)); *Knight*, 306 F.3d at 536 ("In any event, Trooper McGlaughlin's search of Mr. Knight's briefcase quite obviously exceeded the authority vested in him by the North American Standard Inspection Program, and thus it exceeded the scope of a constitutionally permissible regulatory search."); *Showers*, 182 F.2d at 174 ("Thus, a reasonable officer in Spangler's position would have known that the actions he undertook in this case were not authorized by either the administrative statute or regulation then in place. Because the boundaries of his inspection authority were, in fact, clearly established—and did not include the use of administrative inspection to randomly and extensively search for evidence of crimes—Spangler is not entitled to qualified immunity."); *Russo v. Massullo*, 927 F.2d 605, at *4 (6th Cir. 1991) (unpublished table decision) ("Although we agree with the defendants that they had a right to conduct an administrative inspection based on the presumptive constitutionality of the statute, we do not agree that the statute was enough to clothe in qualified immunity those actions which went beyond those specifically authorized by the statute.").

Accordingly, Defendants' motion to dismiss is denied as to Counts I and II.

## II. Due Process Claims

Donald also asserts two claims under the Due Process Clause of the Constitution. He claims that Defendants have violated his "substantive property rights without due process" and his "procedural due process rights." (Doc. 19 ¶¶ 47–51.)

But any claim Donald might have regarding a violation of a substantive due process right is superseded by his Fourth Amendment claims. Donald's claim is that Defendants allegedly seized his property unlawfully. Since the Fourth Amendment "provides an explicit textual source of constitutional protection against [this] particular sort of government behavior, that

Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" his claims. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks and citation omitted); *see also Heidorf v. Town of Northumberland*, 985 F. Supp. 250, 256–57 (N.D.N.Y. 1997) (holding that plaintiff could not assert substantive due process claim regarding defendants' seizure of plaintiff's property since plaintiff could resort to Fourth Amendment as an "explicit textual source" for that protection).

Nor can Donald proceed with his claim that he has been deprived of his procedural due process rights. To state a procedural due process claim, a plaintiff must allege: "(1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). Specifically, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The complaint makes no allegation regarding the availability of postdeprivation procedures, much less whether those procedures are inadequate, so this claim fails as well. *See Ahlers v. Rabinowitz*, 684 F.3d 53, 63–64 (2d Cir. 2012) (holding that procedural due process claim was insufficiently alleged where plaintiff did not "allege[] whether formal post-deprivation procedures were available to him").

Accordingly, Defendants' motion to dismiss is granted as to Counts III and IV.

### III.   Search-and-Seizure Claim under the Vermont Constitution

Donald also claims that Defendants violated his right under Chapter I, Article 11 of the Vermont Constitution to be free from unlawful searches and seizures. (Doc. 19 ¶ 52–56.) The search-and-seizure protection of Article 11 generally "import[s] the reasonableness criterion of

the Fourth Amendment," *State v. Medina*, 2014 VT 69, ¶ 13, 197 Vt. 63, 102 A.3d 661 (internal quotation marks and citations omitted), although Article 11 may also offer protections broader than the Fourth Amendment. *State v. Roberts*, 160 Vt. 385, 392, 631 A.2d 835, 840 (1993). The Supreme Court of Vermont has also expressly imported into its Article 11 jurisprudence the *Burger* standard for determining the lawfulness of administrative searches. *See State v. Welch*, 160 Vt. 70, 78–84, 624 A.2d 1105, 1110–1112 (1992). Because Donald states a claim under the Fourth Amendment, he also states a claim under Article 11.

Since the Vermont Supreme Court has also adopted the federal qualified immunity test to determine whether state actors are entitled to qualified immunity from state tort and constitutional claims, Defendants are not entitled to qualified immunity from the state constitutional claim. *See Stevens v. Stearns*, 2003 VT 74, ¶¶ 14–21, 175 Vt. 428, 833 A.2d 835; *Murray v. White*, 155 Vt. 621, 627–631, 587 A.2d 975, 978–981 (1991).

Accordingly, Defendants' motion to dismiss is denied as to Count V.

## IV.  Replevin

Donald also seeks replevin of both the video recording and the video player that Defendants allegedly seized. (Doc. 19 ¶¶ 57–62.)

In a footnote, Defendants assert that the court lacks jurisdiction over the replevin claim because 12 V.S.A. § 5331 provides that replevin actions must be brought in courts "in the county in which the goods are detained." (Doc. 21 at 19 n.7.) Both the tavern and the Department of Liquor Control are located in Washington County, Defendants assert, while this court sits in Chittenden and Rutland Counties.

The court can exercise supplemental jurisdiction over the replevin action. A federal district court has supplemental jurisdiction "over all other claims that are so related to claims in

15

the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164–65 (1997). There is no question that the replevin action is part of the same case or controversy as Donald's constitutional claims. And state statutes that limit venue to state courts in particular counties do not bar a federal court's exercise of its supplemental jurisdiction. *See Chicago & N.W. Ry. Co. v. Whitton's Adm'r*, 80 U.S. 270, 286 (1871) ("The statutes of nearly every State provide for the institution of numerous suits, such as for partition, foreclosure, and the recovery of real property in particular courts and in the counties where the land is situated, yet it never has been pretended that limitations of this character could affect, in any respect, the jurisdiction of the Federal court over such suits where the citizenship of one of the parties was otherwise sufficient."); *Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 931–32 (8th Cir. 2016) (citing *Whitton*); *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 554–55 (5th Cir. 2013); *Beckworth v. Bizier*, 48 F. Supp. 3d 186, 206 n.6 (D. Conn. 2014).

On the merits, Defendants argue that the claim for replevin fails because the complaint does not allege that "Defendants continue to possess the surveillance equipment," (Doc. 21 at 18–19) and that, under *State v. Wetherbee*, 2004 VT 101, ¶ 22, 177 Vt. 274, 866 A.2d 527, a replevin action cannot be maintained "against a defendant who, at the time the action is instituted, is not in possession of or cannot exercise control over the property sought."

The complaint alleges that "[a]fter tearing the surveillance system from the wall, defendants Welch and Goggins unlawfully detained the system as well as its contents, including electronic video surveillance footage." (Doc. 19 ¶ 60.) Even though it does not use the word

16

"possess," the sentence sufficiently alleges—or at least allows the court to reasonably infer—that Defendants still possess the items seized.

In their motion, Defendants assert that they "do not possess" the surveillance equipment, (Doc. 21 at 18–19) and at oral argument counsel for Defendants specified that the seized video recording and video player are currently in the physical possession of an expert who can decode the video recording. But these assertions, which are outside the pleadings in any event, do not defeat the inference that Defendants may be in constructive possession of the items seized. That is sufficient for a replevin action under *Wetherbee*.

Accordingly, Defendants' motion to dismiss is denied as to Count VI.

## V.     Gross Negligence Claim

Both Donald and Michelle assert a claim of gross negligence against Defendants. (Doc. 19 ¶¶ 68–71.) The complaint alleges that Defendants had a duty "to act in accordance with the prevailing standard of care applicable to law enforcement officers," and that Defendants "breached this duty with gross, reckless and/or deliberate indifference." (*Id.* ¶¶ 69–70.)

A negligence claim is demonstrated by: "the existence of a legally cognizable duty owed by the defendant to the plaintiff, breach of that duty, such breach being the proximate cause of plaintiff's injury, and actual damages." *Powers v. Office of Child Support*, 173 Vt. 390, 398, 795 A.2d 1259, 1265 (2002). But Plaintiffs do not identify, either in their complaint or their response to the motion to dismiss, any source of a duty Defendants owed to Plaintiffs. (Doc. 19 ¶ 69; Doc. 22 at 12.) The court notes that Vermont law does not create a special duty between law enforcement personnel and crime victims generally. *Kane v. Lamothe*, 2007 VT 91 ¶¶ 7–9, 182 Vt. 241, 936 A.2d 1303. Without specific argument by Plaintiffs to the contrary, the court cannot find any basis to conclude that Vermont law creates a tort duty owed to licensees by

17

agents of the Department of Liquor Control (who are law enforcement officers by statute, *see* 7 V.S.A. § 561(a)) under the circumstances alleged here. Moreover, the complaint only alleges intentional conduct, it does not allege any negligent or reckless conduct.

Accordingly, Defendants' motion to dismiss is granted as to the second count titled "Count VII."

## VI.   Negligent Infliction of Emotional Distress

The last claim at issue is Michelle's claim, captioned as a claim of negligent infliction of emotional distress. She alleges that Defendants' actions caused her to "experience[] difficulty breathing and suffer[] emotional distress." But a plaintiff asserting a claim for negligent infliction of emotional distress must show that she "(1) was within the 'zone of danger' of an act negligently directed at plaintiff by defendant, (2) was subjected to a reasonable fear of immediate personal injury, and (3) in fact suffered substantial bodily injury or illness as a result." *Vincent v. DeVries*, 2013 VT 34 ¶ 12 n.2, 193 Vt. 574, 72 A.3d 886 (internal quotation marks and alterations omitted). The complaint does not allege any facts that would establish these elements.

Accordingly, Defendants' motion to dismiss is granted as to the first count titled "Count VII."

## Conclusion

Defendants' motion to dismiss (Doc. 21) is GRANTED IN PART and DENIED IN PART.  It is granted as to Counts III and IV, and both Counts VII.  It is denied as to Counts I, II, V, and VI.

Dated at Rutland, in the District of Vermont, this \_\_\_ day of January, 2017.

_____
Geoffrey W. Crawford, Judge
United States District Court